Clifton E. Baird and Violet L. Baird v. Commissioner.
Baird v. Commissioner
Docket Nos. 60132, 63907.
United States Tax Court
T.C. Memo 1957-192; 1957 Tax Ct. Memo LEXIS 58; 16 T.C.M. (CCH) 867; T.C.M. (RIA) 57192; October 9, 1957
*58 Lester M. Ponder, Esq., 1313 Merchants Bank Building, Indianapolis, Ind., and William L. Thompson, Esq., for the petitioners. Robert E. Johnson, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion These consolidated proceedings involve deficiencies in income tax of petitioners as follows: Docket No.
Year
Deficiency
60132
1952
$16,499.72
1953
23,086.16
63907
1954
7,434.72
The sole issue is whether certain amounts are taxable as income when earned and credited by finance companies to the dealer's reserve accounts of petitioners' accrual basis partnership. The other issue raised by the petition has been conceded by petitioners. Findings of Fact Most of the facts have been stipulated and are found accordingly. Petitioners are husband and wife residing in Salem, Indiana. They filed joint returns for the calendar years involved with the district director of internal revenue for the district of Indiana, on the cash basis. Petitioners are equal partners, doing business under the name Baird Trailer Sales, hereinafter referred to as the partnership. It has engaged, since its organization in January 1947, in the *59 sale of new and used mobile homes, usually referred to as house trailers, and to a lesser extent in new and used cars, parts and accessories, furniture, and real estate, in Salem, Indiana. Partnership returns were filed for the fiscal years ended February 28, 1952, 1953, and 1954, and an amended return for the fiscal year ended February 28, 1952. The partnership kept its books and filed its income tax returns on an accrual method of accounting. The partnership books reflected gross sales and cost of sales for the fiscal years ended February 28, 1952, 1953, and 1954, as follows: 1952
1953
1954
Gross
sales
$1,025,943.89
$1,337,385.64
$1,067,144.18
Cost of
sales
859,746.75
1,141,308.59
908,027.87
During the taxable periods involved the partnership sold most of its trailers under conditional sales contracts. It sold such contracts to only three finance companies, namely: Minnehoma Financial Company, Tulsa, Oklahoma; Michigan National Bank, Grand Rapids, Michigan, and Midland Trailer Finance Corporation, hereinafter referred to as "Minnehoma", "Michigan", and "Midland", and collectively referred to as the "Finance Company" or, the "Finance Companies. *60 " In such cases the purchaser executed a note payable to the partnership for the unpaid purchase price of the trailer, plus insurance, interest, and financing charges, and gave a chattel mortgage on the trailer as security. In the case of Minnehoma the contract took the place of the note payable. Most of the notes accepted by the partnership in part payment for trailers were sold to one of the above-named companies in accordance with the terms of agreements between the partnership and each finance company. In the taxable years, the partnership handled its note business substantially with Midland. The partnership and Minnehoma signed a document pertinent only to new trailer coaches manufactured by Spartan Aircraft Company, dated December 30, 1949, entitled "Agreement Covering Purchase of Conditional Sales Contracts" which contained inter alia, the following provisions: "1. The Dealer shall not be obligated to sell any conditional sales contracts to Minnehoma, but may offer Minnehoma such contracts as the Dealer may from time to time choose, and Minnehoma shall not be obligated to purchase or acquire any contracts offered for sale and assignment by the Dealer, but shall purchase *61 only such contracts as it is willing to do. This agreement shall govern only the sale and assignment of such conditional sales contracts as the Dealer shall elect to sell and Minnehoma shall indicate its willingness to purchase and acquire. * * *
"6. The purchase price of each conditional sale contract purchased by and assigned to Minnehoma hereunder shall be equal to the retail cash sales price of the trailer coach and all extra equipment plus all sums paid by the Dealer as required hereunder for sales and other taxes, extras and filing and recording fees less the amount of the down payment made by the purchaser in cash and/or by trade-in allowance. "7. The Dealer unconditionally guarantees the payment of all sums required to be paid under each conditional sale contract purchased by and assigned to Minnehoma hereunder when such payment shall become due. In the event that the purchaser defaults or fails to pay any installment due under any conditional sale contract purchased by and assigned to Minnehoma hereunder, the Dealer agrees to demand of Minnehoma to pay such sum then due or, upon request of Minnehoma, to re-purchase from Minnehoma for the entire balance remaining unpaid *62 under said conditional sale contract. * * *" No provision appears in the 1949 agreement for the withholding of any dealer reserve by Minnehoma. On November 8, 1950, the December 30, 1949 agreement was superseded by an "Agreement Covering Purchase of Conditional Sales and Other Time Sales Contracts." Paragraphs 6 and 7 of the 1950 agreement provide as follows: "6. The purchase price of each contract purchased by and assigned to Minnehoma hereunder shall be equal to 95% of the aggregate of the retail cash sales price of the trailercoach and all extra equipment and all sums paid by the Dealer as required hereunder for sales and other taxes, extras and filing and recording fees less the amount of the down payment made by the purchaser in cash and/or by trade-in allowance. "7. An amount to be determined by Minnehoma from time to time in its absolute discretion equal to not more than 5% of the aggregate of the retail cash sales price of the trailercoach and all extra equipment and all sums paid by the Dealer as required hereunder for sales and other taxes, extras and filing and recording fees less the amount of the down payment made by the purchaser in cash and/or by trade-in allowance *63 will be credited by Minnehoma to a special reserve account in the name of the Dealer hereunder as to each contract purchased by and assigned to Minnehoma hereunder, which account will be referred to as the 'Dealer Reserve Account'. In addition, Minnehoma may credit to such Dealer Reserve Account hereunder, but shall not be obligated so to do, one-fifth (1/5) on new trailers and one-sixth (1/6) on used trailers, or such other portions as Minnehoma may determine from time to time, of the finance charge paid or agreed to be paid by the purchaser in each contract. In addition to and without affecting any or all of its rights hereunder, Minnehoma may, at its own option, charge against the Dealer Reserve Account any sums that the Dealer may at any time owe to Minnehoma in any connection whatsoever. In the event and at such time or times as the Dealer Reserve Account shall exceed 15% of the aggregate unpaid balances of all contracts purchased by and assigned to Minnehoma hereunder by the Dealer plus all contingent liabilities which, on the sole determination of Minnehoma, it may have with respect to such contracts, Minnehoma will pay such excess to the Dealers from time to time as determined *64 by Minnehoma but not more frequently than once each month. In the event that and at such time as all contracts as shall have been purchased and assigned to Minnehoma by the Dealer shall have been paid in full and no sums shall remain unpaid thereunder and in the opinion of Minnehoma there shall be no contingent liability on the part of Minnehoma with relation thereto, Minnehoma shall pay to the Dealer the balance of the credit in such Dealer Reserve Account. Minnehoma's determination as to the possibility of contingent liability shall be final and not subject to question by the Dealer." Credits to the dealer reserve account in amounts usually five per cent of the aggregate retail cash sales price of the trailer were entered on the books of Minnehoma. The 1950 agreement continued to provide that the dealer-partnership "unconditionally guarantees the payment of all sums required to be paid under each contract purchased by and assigned to Minnehoma hereunder when such payment shall become due." On December 21, 1950, the amount of finance charge that Minnehoma had been crediting to the partnership's reserve account was changed from one-fifth to one-tenth on new trailers, and from one-sixth *65 to one-twelfth on used trailers, effective January 1, 1951. The written portion of the agreement between the partnership and Michigan is contained in a "Collateral Assignment" providing, in part, as follows: "FOR VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, the undersigned hereby sells, assigns, transfers, and conveys unto MICHIGAN NATIONAL BANK, of Grand Rapids, Michigan, its successors, and assigns forever irrevocably, all of his, its, or their right, title and interest in certain sums of money now on deposit or that may hereafter be deposited in the MICHIGAN NATIONAL BANK, of Grand Rapids, Michigan, and identified and represented by Reserve account in the name of the undersigned in the MICHIGAN NATIONAL BANK. "This Assignment and Transfer is made as collateral security for the payment of the direct and indirect liability of the undersigned to the said MICHIGAN NATIONAL BANK of Grand Rapids, Michigan, and to secure the payment of the several notes representing said direct and indirect liability and any renewal or renewals thereof, or any installment payment or payments and to secure any obligation which may arise which the undersigned may owe to said *66 MICHIGAN NATIONAL BANK, of Grand Rapids, Michigan. "In the event of default in the payment of said liability or any installment thereof, or any of the several notes at the time when same shall fall due or in the payment of the interest thereon or any part of the principal of said liability then the MICHIGAN NATIONAL BANK, of Grand Rapids, Michigan, at their election, notice of said election being hereby expressly waived, may apply the total of said sums of money represented by said Reserve account at the date of election or any part thereof to meet the default in the liability. "Whenever the indebtedness secured hereby is paid in full the MICHIGAN NATIONAL BANK, of Grand Rapids, Michigan, shall reassign said sums of money represented by said Reserve account along with all right, title and interest back to the undersigned. "If in the opinion of the bank the undersigned dealer's account is in good standing, all sums in this reserve account in excess of ten per cent (10%) of the gross unpaid balance of all contracts outstanding on February 28 of each year will promptly be returned to the undersigned dealer. The above agreement did not contain the provisions by which amounts representing *67 a percentage of the aggregate sales price of the trailers or amounts representing a percentage of the finance charge were credited to the partnership's account on the finance company's books. The written portion of the original agreement between the partnership and Midland is embodied in two letters dated December 3 and 18, 1951, containing, in part, the following: "* * * The retail paper is to be endorsed by you with recourse. "Our advance on new trailer paper will be 97% on the unpaid cash balance and on used trailer paper, for 95% on the unpaid cash balance. The differentials of 3% and 5% will accumulate to provide you with a loss reserve. When this reserve fund exceeds 10% of your outstandings, the excess will be paid to you automatically." On and after June 10, 1952, the partnership notes were sold to Midland under the terms of a letter from Midland dated June 4, 1952, which provides, in part, as follows: "Beginning on June 10, we will set up a dealer profit reserve equal to 1% of the unpaid cash balance of each retail contract. This profit reserve will be derived from the service charge and it will be paid to the dealer when the retail contract is paid out. "Effective *68 also on June 10, the dealer reserves of 3% on new transactions and 5% on used transactions, will be paid to the dealer when the contract is paid out. This procedure will be followed on all types of payoffs, including payment by the purchaser at maturity, anticipation by the purchaser or payment by the dealer in the cases of trade-ins or repossessions." Under the terms of its agreements with the three finance companies, the partnership sold most of its trailer notes to the finance companies for the deferred purchase price of the trailers plus in certain cases a percentage of the interest or finance charges. As each note was transferred to it with recourse, the finance company remitted to the partnership the amount due it on the selling price of the trailer as above-described, less an amount which was credited on its books to an account in the name of the partnership designated "Dealer Reserve Account" by Minnehoma and Midland and designed "Dealer Escrow Account" by Michigan. Hereinafter, the use of the phrase "Dealer Reserve Account" includes the phrase "Dealer Escrow Account." The amount withheld and credited to such account was usually 5 per cent of the unpaid balance on each note, *69 or with some finance companies on a new trailer only 3 per cent of the unpaid balance of the note. Further, in certain instances, Minnehoma and Midland also credited to the partnership's account a portion of the finance charge. At the time of sale, the finance companies sent the partnership a memorandum of the amount thus withheld and credited. The partnership also received periodic statements of the balances in the accounts designated "Dealer's Reserve" or "Dealer's Escrow Account" from the finance companies. On the sale of a note, the partnership always endorsed the note to the finance company either with recourse and/or with their guaranty of the unpaid balance of the note. The agreements with the three finance companies either oral or written contained the following provisions: "(a) In the event the retail purchaser's contract became due and unpaid, the finance company could charge the account of the partnership designated 'Dealer Reserve' with the unpaid balance; "(b) In the event the partnership had a matured financial obligation of any nature to the finance companies, the amount of such obligation could be charged to the partnership's account designated 'Dealer Reserve'; *70 "(c) Repossession losses of the finance companies could be charged to the account of the partnership designated 'Dealer Reserve'; "(d) The ultimate balance in the account of the partnership designated 'Dealer Reserve' after payment of all notes by the partnership to the finance companies was to be paid to the partnership; and "(e) Each finance company could look to the balance in the account designated 'Dealer Reserve' of the partnership to satisfy any default by the partnership on its guaranties and obligations to the finance company, as well as any default by the makers of the notes." The written portion of the foregoing agreements was prepared by the finance companies. The partnership was not required by the finance companies to do business with one company to the exclusion of other companies who dealt in paper of the nature of that purchased from the partnerships. The partnership was not financially able to carry the contracts of sale or the floor plan and carry the inventory of trailers held for sale, but relied upon finance companies and certain banks. The accounts on the finance company's books designated "dealer's reserve" for the partnership were reflected as a *71 liability of the finance company and the annual balances in such accounts were not reflected in the income of the finance company. During the years here involved, the partnership (by way of illustration) recorded the sale of a trailer and the sale of the note on its books and records as follows: Sales Receipt Journal Entry
Cash and/or Trade-in Al-
lowance
$1,745.00
Contracts Receivable-
Finance Company
3,800.00
Trailer Sales
$5,545.00 When the finance company remitted the check, the following entry was made: Reserve-Finance Company
$ 190.00
Cash
3,632.67
Expense for Intangible
Stamps
1.38
Contracts Receivable
$3,800.00
Expenses (Credit Check)
24.05
$3,824.05
Cost of Sales
$3,824.05
Credit Inventory
$3,824.05
When a purchaser defaulted on his contract and note, the trailer was repossessed upon receipt of notice of default. The partnership always paid the finance company the unpaid balance due on such note and recorded such payment on its books and tax returns as a purchase. Where defaults occurred on the notes payable to the partnership, the payments paid to the finance companies as a result of the defaults *72 were included on the partnership's fiscal year 1952, 1953, and 1954 returns as part of cost of goods sold. On resale of the repossessed trailer, the receipts therefrom were reported as gross receipts. For example, if a trailer costing $5,545 with notes payable outstanding of $3,500 was repossessed and the trailer's fair market value was only $3,000, the loss, if any, was reflected on the partnership's books and records as part of cost of goods as follows: The bookkeeper of the partnership either on the date of repossession or at the close of the fiscal year charged $500 to overallowance on trailers and recorded the purchase price of the trailer in cost of used trailers at $3,000 (its fair market value). However, if the trailer was sold during the fiscal year in which it was repossessed, and the bookkeeper had not charged $500 to overallowance on trailers, the purchase price of the trailer was reflected in cost of used trailers at $3,500, and the sales price of $3,000 reported in gross receipts. In the event the notes payable outstanding were $3,000 or less in the above example, the purchase price of the trailer was reflected in cost of used trailers at the amount paid by the partnership *73 on the unpaid balance of the note payable. The finance company remitted to the partnership the amount which had been credited to the account designated "Dealer Reserve" with respect to such defaulted contract and note and the partnership reported such amount in taxable income for the year of receipt except for the years 1947 and 1948, when the credit to the amounts designated "Dealer Reserve" were included in taxable income. During the fiscal years ended February 28, 1952, 1953, and 1954, Minnehoma, Michigan, and Midland credited the following total amounts in the account of the partnership designated "Dealer's Reserve" on the books of such companies: 1952
$25,816.58
1953
29,560.54
1954
29,660.49
During the fiscal years ended February 28, 1952, 1953, and 1954, the partnership received the respective amounts of $1,217.94, $1,778.94, and $9,141.39 from finance companies out of its accounts designated "Dealer Reserve" on the books of the finance companies including Union Bank of Michigan, Pioneer Finance Company, Kent Bank, and Evansville Morris Plan to which the partnership had sold notes. On its returns for the taxable years 1952, 1953, and 1954, the partnership *74 deducted specific bad debts in the respective amounts of $1,203.75, $2,239.12, and $1,203.69, a portion of such deductions were unpaid amounts due the partnership for accessories, supplies, and repairs. The remainder consisted of advances by the partnership to meet trailer purchaser's payments which the purchaser was unable to make and after advancement a default by the purchaser occurred. In computing the gross receipts reported in its returns for the taxable years involved, the partnership deducted the total amount credited by the finance companies in each year to the partnership's account designated "dealer's reserve" from gross sales to arrive at the amount reported as gross receipts on its returns. Respondent included such amounts in the partnership's income. In determining the contested deficiencies, the respondent reduced the total amounts credited by the finance companies to the partnership dealer's reserve account by the amounts received by the partnership from the finance companies in the respective taxable years, and added the net amounts to the partnership income. Opinion LEMIRE, Judge: The question presented is whether the amounts credited by finance companies *75 to a dealer's reserve account of petitioners' accrual basis partnership constitute income in the year credited or in the year the partnership is entitled to payment. The amounts involved are not in dispute. Most of the facts are stipulated, together with certain testimony from the Blaine & Evelyn K. Johnson case, , and set forth in exhibit 26-Z, received in evidence herein. The record and the facts found herein bring the instant case within the ambit of our decisions holding that amounts credited by financing institutions to a "dealer's reserve" account of an automobile or trailer dealer on an accrual basis of accounting are income in the year credited. ; Blaine Johnson, supra; ; , on appeal [C.A.-5]; , on appeal [C.A.-5]. Petitioners rely upon the reversal of the Blaine Johnson case, supra, (C.A.-4), . The Blaine Johnson case, supra, reversal has been reexamined in the recent cases of , *76 , and , and with due deference to the views expressed by the Circuit Court, we have adhered to our own decisions, and so follow them in the present proceeding. We, therefore, sustain the respondent's determinations that the uncontroverted amounts credited to the dealer's reserve account of petitioners' partnership in the respective taxable years ended February 28, 1952, 1953, and 1954, constitute income of the partnership distributable to petitioners. Decisions will be entered for the respondent.